# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA
### CASE NO. 1:16-CV-23670-RNS

|  |  |
|---|---|
| **SEBASTIAN A. ROJAS, on behalf of himself and all others similarly situated,** | **FLSA COLLECTIVE ACTION** |
| **Plaintiff,** |  |
| **v.** |  |
| **UBER TECHNOLOGIES, INC., a Delaware corporation, _et al._,** |  |
| **Defendants.** |  |

## DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR CONDITIONAL CERTIFICATION OF COLLECTIVE ACTION

## I.  PRELIMINARY STATEMENT

Plaintiff Sebastian Rojas's ("Plaintiff") *Motion for Conditional Certification of Collective Action* (the "Motion") [ECF No. 43] of a nationwide class of independent-contractor drivers who had accounts on Uber Technologies, Inc.'s lead generation app (the "Uber app") is fatally flawed. Plaintiff does not have standing to make the request because the claim is now property of his bankruptcy estate. Even if Plaintiff's pursuit of a representative action was appropriate, his Motion fails to establish (1) that other similarly situated individuals desire to opt-in; and (2) that "all uberX, uberSUV, and uberBLACK drivers" across the nation are similarly situated with respect to their "job requirements and with regard to their pay provisions." *See Dybach v. State of Fla. Dep't of Corr.*, 942 F.2d 1562, 1567-68 (11th Cir. 1991). Plaintiff is not due the same lenient standard afforded to a pre-discovery motion for conditional certification, but even if he was, **one opt-in** does not demonstrate sufficient interest in joining this suit to issue notice to thousands of people.[1] *Powell v. Carey Int'l, Inc.*, 2006 WL 4562105, at *4 (S.D. Fla. Mar. 27, 2006) ("In order to proceed as a collective action, a plaintiff is *required* to demonstrate, through the pleadings and affidavits, that . . . there are other employees of the employer who desire to opt-in[.]"), citing *Dybach*, *supra* (emphasis added). Furthermore, the only unifying characteristic between the diverse putative collective is their status as independent contractors, which is *per se* insufficient. Each individual driver's relationship with Uber varies based on, *inter alia*, (1) time period; (2) market; and (3) product(s) used. These variations directly impact the analysis of any individual driver's "employee" status under the FLSA's economic realities test because, among other reasons, they impact the nature and degree of any control exercised by Uber. The individualized inquiries required to manage this case contravene the basic theory of judicial economy upon which the FLSA's collective action procedure is based. The Court should therefore deny Plaintiff's Motion in its entirety.

## II.  RELEVANT BACKGROUND

On August 26, 2016, Plaintiff commenced an action against Defendant Uber Technologies, Inc. ("Uber") for alleged violations of the Fair Labor Standards Act of 1938, 29

---

[1] Defendants have approximately 15,000 arbitration opt-outs from drivers, but have not yet determined how many of these purported opt-outs are valid, or how many meet Plaintiff's specific class definition. [Declaration of Michael Colman ("Colman Decl."), ¶22.], attached as Exhibit A.

USC §§201-219 (2016) ("FLSA") on behalf of himself and all others similarly situated. *See generally,* Complaint at ECF No. 1. By way of his Second Amended Complaint [ECF No. 38], Plaintiff asserts these same claims against Uber and various Uber subsidiaries.

Plaintiff entered into a contractual arrangement first with Defendant Rasier, LLC, and then with Defendant Rasier-DC, LLC, to access the Uber app to provide independent, peer-to-peer transportation services to riders. [Colman Decl. ¶ 5, Exs 13, 17.] Pursuant to those agreements, Plaintiff was free to log on to the Uber app when, where, and for whatever increment of time he chose, to receive requests for transportation services from riders in his vicinity. [*See* Colman Decl. Exs 13, 17, at 2.4 ("You retain the sole right to determine when and for how long you will utilize the Driver App or the Uber Services.").]

Plaintiff contends he was misclassified as an independent contractor and is entitled to unpaid minimum wages and overtime. His Motion seeks conditional certification of: "every person who drove for Uber as UberX, Uber Black or Uber SUV drivers within the United States" who (1) was paid in his/her individual capacity and timely opted out of arbitration. [ECF No. 38, ¶27.] While this action has been pending for eight months, only one person--Opt-in Plaintiff James Schultz (San Diego, CA)--submitted a consent to join. [ECF No. 40.]

On April 3, 2017, Plaintiff commenced a proceeding with the Judicial Panel on Multidistrict Litigation seeking to centralize this case with two other FLSA cases pending in other jurisdictions that similarly assert nationwide collective actions, and to have those cases transferred to this Court, which Uber opposes. Plaintiff's asserted reason for initiating Multidistrict Litigation ("MDL") was to generate one ruling on a motion for conditional certification. Yet, he did not seek to delay this Court's ruling on the Motion and has not filed a copy of his transfer motion with this Court. Aside from the two cases that Plaintiff Rojas seeks to coordinate in his MDL filing, there are multiple regional or state-wide FLSA actions that render a nationwide collective action of limited benefit. *See, e.g., Del Rio v. Uber*, 3:15-cv-03667-EMC (N.D. Cal.); *Carey v. Uber*, 1:16-cv-01058 (N.D. Oh.); *Bonke v. Uber*, 2:16-cv-01534-SPL (D. Az.); *Olivares v. Uber*, 16-cv-06062 (N.D. Ill.); *Romine v. Uber*, 3:16-cv-371 (E.D. Tenn.); *Bradshaw v. Uber*, 5:16-cv-00388-R (W.D. Okla.); *NYTWA v. Uber*, 16 civ 04098 (S.D.N.Y.); *Cavallo v. Uber*, 3:16-cv-4264-FLW-DEA (D. N.J.); *Lathan v. Uber*, 16-cv-794-CNC (E.D. Wis.).

## III.   RELEVANT FACTS

**A.   Uber's business model.**

    1.   Uber offers multiple products.

Uber is a San Francisco-based technology company that developed an online marketplace accessible through the Uber app. [Colman Decl. ¶ 3.] The app allows people needing service to connect with individuals and businesses offering those services. [*Id.*] Although many services can be arranged through the Uber app, the most well-known (and relevant for this case) are Uber's products that permit individuals needing a ride ("riders") to connect with nearby, available independent-contractor drivers. [*Id.*] These products include: (1) uberX—cost-efficient, everyday vehicles; (2) uberXL—large, everyday vehicles to carry more passengers; (3) uberPOOL—ridesharing with another rider heading to the same general location; (4) UberSELECT or UberLUX—higher-end, luxury vehicles; (5) UberBLACK—town cars operated by commercially licensed third-party transportation companies; (6) UberSUV—luxury SUVs operated by commercially licensed third-party transportation companies; and (7) UberTAXI—taxicabs affiliated with local cab companies. [*Id.*] Each product gives riders the options to connect with a different vehicle at a different price. [*Id.*] The app is available to riders and drivers in over 150 distinct markets across the U.S., covering over 40 states. [*Id.* ¶ 4.] Not all the product options listed above are offered in every market, or even within the same state. [Colman Decl.¶¶ 3-4.]

Plaintiff and Opt-in Plaintiff Schultz each only provided services in one market: Miami (South Florida), FL and San Diego, CA, respectively. [Moshkani Decl. ¶ 6;[2] Colman Decl. ¶ 54.] Plaintiff has used uberX, uberXL, uberLUX, uberLUX-SUV, and uberPOOL. [Moshkani Decl.¶ 6.] Two products in Plaintiff's putative collective definition-UberBLACK and UberSUV (both of which are commercial livery products)-have never operated in South Florida, the only location where Plaintiff used the Uber app. [*Id.* ¶ 7.]

Rasier, LLC, Rasier-CA, LLC, Rasier-PA, LLC, Rasier-DC, LLC, Rasier-MT, LLC and Hinter-NM, LLC are wholly-owned subsidiaries of Uber that provide the ride lead-generation services to individual (as opposed to commercially licensed) drivers ("peer-to-peer drivers"), like Plaintiff and Opt-in Plaintiff Schultz, primarily through the uberX and uberXL products.

---

[2] The Sworn Declaration of Kasra Moshkani ("Moshkani Decl.") is attached as Exhibit "B".

[Colman Decl. ¶ 5.] These entities provide lead generation services to individuals in certain states. [*Id.*] Opt-in Plaintiff Schultz's online services agreement was with Rasier-CA, LLC, which provides lead-generation services in California. [*Id.*]

      2.    <u>Drivers have agreed to many different contracts.</u>

Before a driver can use the Uber app, each executes an online services agreement with Uber or one of Uber's subsidiaries that governs their use of the Uber app. [Colman Decl. ¶ 10.] During the three-year period that Plaintiff claims is the applicable statutory period, Uber and Uber's subsidiaries used 17 agreements (12 online service agreements and 5 driver addenda) with drivers. [*Id.* ¶ 15(a)-(q).] Plaintiff accepted only two of these agreements; Opt-in Plaintiff Schultz accepted only 3 of these agreements and addenda. [*Id.* ¶¶49-51, 54-56, Exs. 7, 10b, 13, 17.] These agreements are not identical, even for drivers using the same product, and have changed over time. [*Id.* ¶¶ 15-16, Exs. 1-17.] For example, the December 2013 and June 21, 2014 Rasier Software Sublicense and Online Services Agreements ("Rasier Agreements") prohibit the simultaneous use of other lead-generation apps such as Lyft, and affirmative acknowledgements by the driver there is "no tipping" for trips arranged via the Uber app. [*Id.* Exs. 7, 8(a)-(b), 9(a)-(b).] The other contracts contain no such language. [*Id.* Exs. 1-6, 10(a)-17.] The user agreements for the UberBLACK and UberSUV products are also markedly different because the commercially licensed drivers have an existing subcontractor or employee relationship with a transportation company that Uber or one of its subsidiaries has entered into a separate contractual relationship with. [*Id.* ¶ 18.]

**B.**    **<u>Drivers' varying business operations and experiences using the Uber app.</u>**[3]

Drivers' practices and experiences vary greatly depending on their location and personal choices. Some drivers use the app to grow their new transportation business, some to supplement a large, pre-existing one. [Gebremeskel Decl. ¶¶ 6-7; Parsons Decl. ¶¶ 7-9.] Some drivers partner directly with Uber or Rasier, use a single vehicle, and a single Uber product, but use multiple lead-generation apps (*i.e.*, Lyft, Sidecar, Postmates) besides, and sometimes simultaneously with, Uber. [*E.g.,* Boll Decl. ¶¶ 3-4; J. Gordon Decl. ¶ 15.] Further, there is no requirement that drivers use the Uber app for navigation. [Moshkani Decl. ¶36.] This is in direct contrast to Plaintiff's claim, based on his knowledge and belief, all drivers must use the Uber app to receive, accept,

---

[3] Defendants have attached and filed a compendium of declarations cited in Section III.B. as Exhibit "D."

and navigate to rides. *See* ECF No. 43-2, *2.

Some drivers choose to drive when and where they can make the most money; others prefer to drive in locations with which they are familiar, or because they like the clientele. [Cone Decl. ¶ 8; Morales Decl. ¶ 6; Crist Decl. ¶ 8, Sherman Decl., ¶ 8.] Some drive simply to have something to do. [Blair Decl. ¶ 12; Alexis Decl. ¶ 3.] Some drivers reject or cancel very few rider trip requests; other drivers have rejected ***thousands***, or even over ***10,000*** trips. [Colman Decl. ¶ 6; P. Gordon Decl. ¶18.] Plaintiff has cancelled or rejected **2,422** trips. [*Id*.]

Drivers' usage of the app also varies as wildly as Plaintiff's own individual use does. Most of the putative collective, over 60%, have never used the Uber app 40 hours in any week. [Colman Decl. ¶ 33.] For example, Opt-in Plaintiff Schultz has never been on-app 40 or more hours in any week, and cannot have conceivably suffered an overtime violation, even if all time he spent on-app is compensable (which Defendants deny). [*Id*. ¶ 57.] Opt-in Plaintiff Schultz only used the app approximately 66% percent of the weeks between his date of sign up and his last log-on, and averaged approximately 12 hours of time on the app ***per week*** in those weeks in which he logged on at all. [*Id*.]

## C.     Uber's decentralized operations differ from market-to-market.

Each market in which Uber operates is managed independently by its local team. Due to many market-specific factors—including size, geography, population, local events, demographics, weather, driver supply and rider demand, competitor presence, product-type demand (*e.g.*, UberBLACK, UberTAXI, uberX, etc.), micro and macro-economic trends, etc.— each market team also manages itself in an organizationally and operationally unique way, which changed over time.[4] [Colman ¶ 23; Moshkani ¶6; Hughes Decl. ¶6; Black ¶8-22; Maredia Decl.

---

[4] Plaintiff's reliance on isolated testimony from *O'Connor v. Uber Technologies, Inc.*, No-C-13-3826 EMC (N.D. Ca.) is inappropriate. The "application process," "city knowledge test," and instructions to "interviewees" discussed in an order issued in *O'Connor* were never in practice in South Florida. [Moshkani Decl. ¶ 6.] *See also* Motion, at *9, citing *O'Connor v. Uber Technologies, Inc.*, 82 F.Supp.3d 1133, 1136-38 (N.D. Cal. 2015). Also, even in the selective portions of testimony provided by Plaintiff, Mr. Colman repeatedly testified that operations vary by city/market. *See, e.g.*, ECF No. 43-3, at *4, p. 62:18-21 ("That-and again that's going to vary by city…the list can go on depending on-depending on the location."), 163:22-164:1 ("It is changed over time. It depends on the product. It depends on the city. There's not even a general number that I could provide."), 164:18-24 ("There's no particular person or even team that sets the rate for any product or any particular city. These are just decisions that are made generally by the city teams themselves."); 180:8:9 ("So this is going to vary quite a bit based on product and

¶12; McCottry ¶22; Zhou ¶5; McGuire ¶11; Marklin ¶5.]

       a.       <u>Marketing, promotions and communications</u>

Business and marketing decisions are typically made at the local level to address market-specific concerns. Defendants have no contractual right to assign drivers to provide services at any particular time or place. [Moshkani Decl. ¶ 9.] Local operations personnel determine the best way to incentivize drivers to drive when and where demand is expected to be highest. [Colman Decl. ¶ 7; Moshkani Decl. ¶¶ 5, 22-29; Hughes Decl. ¶¶ 7-10; Maredia Decl. ¶23[5]] Both the type and amount offered to drivers for these promotions are determined at the local level. [Colman Decl. ¶ 7; Moshkani Decl. ¶ 5; Hughes Decl. ¶¶ 7, 11.] Despite the local market team's efforts, there are still times where demand outmatches available drivers. [Moshkani Decl. ¶ 24.]

Communications with riders and drivers are also primarily managed at the local level, meaning that the content and volume of communications a driver receives from Uber varies from market to market. [Colman Decl. ¶ 26; Moshkani Decl. ¶¶ 5, 22; Maredia Decl. ¶ 22-23.] As just one example, drivers in San Diego, where Opt-in Plaintiff Schultz resides, typically receive daily communications. [Hughes Decl. ¶ 8.] In Athens, Georgia, drivers receive virtually no email messages. [Marklin Decl. ¶ 7.]

       b.       <u>Quality and acceptance and cancellation practices</u>

The practices used to ensure drivers offer a minimum level of quality to riders also differ across markets. For example, drivers and riders each have the opportunity to rate each other 1-5 stars after every trip. [Colman Decl. ¶ 27.] Defendants have the contractual right to deactivate a driver's account if the ratings received by the driver from riders fall below an established threshold after a certain number of trips. [*Id.*] Traditionally, each market team has set the minimum star ratings threshold for a particular market based on several factors, including average driver rating in that market and rider rating tendencies. [*Id.*] Before 2016, there was no minimum threshold in South Florida. [Moshkani Decl. ¶¶ 29, 32.] In contrast, the San Diego market always had a minimum star rating; however, it has varied over time and varies with the market, particularly in outlying, lower-density areas. [Hughes Decl. ¶¶ 14-15.] Other markets' practices vary widely and have changed overtime. [Black, ¶8; McCottry, ¶18-19; Colby ¶15-16.]

---

potentially location."); 185:12-14 ("It's something that has changed over time. It varies by city, varies even by product); 186:14-16 ("This varies by city. It's going to vary by product.").
[5] The Sworn Declaration of Brian Hughes ("Hughes Decl.") is attached as Exhibit "C."

Another example concerns drivers' practices around rejecting and canceling trips. Prior to mid-2016, many large markets, including Miami, imposed no limitations on a driver's right to reject or cancel trips. [Colby Decl. ¶ 12; Moshkani Decl. ¶ 32.] This is amply demonstrated by the fact that Plaintiff cancelled or rejected more than 2,000 trips himself. [Colman Decl.¶ 6.] The same was true in many small or newly launched markets. [Colby Decl. ¶ 12.] However, in certain larger markets, market teams imposed a trip-acceptance threshold, which, if a driver did not meet, could cause a communication to the driver requesting that the driver log off of the app if they were not ready or did not want to accept trips. [*Id.* ¶¶ 9-11.] In certain extreme circumstances, drivers could be automatically logged off for multiple rejections in a row or even have their account temporarily deactivated for excessive cancellations. [*Id.* ¶ 15.] The specific thresholds for what constituted "excessive" rejections and cancellations were determined by each market team. [*Id.* ¶ 13; Maguire Decl. ¶ 14.] In South Florida, no driver's account has ever been deactivated, temporarily or permanently for low acceptance rates. [Moshkani Decl. ¶ 32.] More recently, South Florida drivers who reject consecutive trips are automatically logged out of the app temporarily, based on the assumption the drivers are unavailable to take trips. [*Id.* ¶¶ 33-34.] Drivers logged out can log back in if and when they are ready to take trips. [*Id.*]

    c.  Defendants' fee and default pricing

Drivers pay Defendants a certain percentage of each fare the drivers' generate using the Uber app as a service fee. [Colman Decl. ¶ 8.] Defendants facilitate the payment electronically and distribute the fare, less Defendants' fee, to the driver. [*Id.* ¶ 9.] The default pricing structure for each product is also driven by the local market. [Moshkani Decl. ¶ 26; Hughes Decl. ¶ 11; Black Decl. ¶¶ 7-8; McCottry Decl. ¶ 22; Zhou Decl. ¶ 5.]

**D.** **A diverse and complex regulatory environment controls for-hire transportation.**

Many jurisdictions in which Uber operates impose different regulatory requirements on Defendants and/or drivers regarding the provision of for-hire transportation services, while other jurisdictions have no specific regulatory requirements. [*See, e.g.,* Maredia Decl. ¶¶ 7-12.] Many regulations govern certain factors Plaintiff argues suggest control by Defendants—background checks, vehicle inspections, training, *etc.* Motion, at *11 (listing "policies" he was subject to). However, these regulations are highly individualized by jurisdiction, and, sometimes highly complex.

In many states, there is not a single set of regulations applicable to drivers who use the

app. Instead, there are separate regulations for individuals who provide peer-to-peer transportation services (typically on uberX, uberXL, uberPOOL), and another for commercially-licensed livery drivers who use the Uber app (typically on UberBLACK, UberSUV). *See, e.g.,* Cal. Pub. Util. Code §§ 5351-5420; Utah Code Ann. § 13-51-103(1) (transportation network company drivers not subject to requirements applicable to common carriers or taxis). [*See also* Colman Decl. ¶¶ 41-48.]

Regarding peer-to-peer drivers, some states have very comprehensive regulations, while other states have no regulations. In California, where Opt-in Plaintiff Schultz resides, the CPUC regulates Uber's subsidiary Rasier-CA, LLC, the entity with whom California peer-to-peer drivers contract, as a Transportation Network Company ("TNC"). As a TNC, Rasier-CA, LLC and the drivers who contract with Rasier-CA, LLC must comply with certain safety and insurance requirements. Cal. Pub. Util. Code § 5431 *et seq.* Among other requirements, the CPUC requires Rasier-CA, LLC to maintain insurance covering certain liabilities arising from a driver's use of a vehicle for trips arranged using the app. [*Id.*] Arkansas' TNC statute requires Defendants to maintain insurance covering drivers, even when they are logged on to the app but not driving, Ark Gen. Stat. 23-13-709(b)(1), while other states require that ***drivers*** carry certain kinds of insurance coverage, imposing no insurance burden on Defendants. [Colman Decl. ¶ 42]; *see also* O.C.G.A. 40-1-193(c)(4) (TNCs must have insurance coverage). *Cf.* New York City Taxi & Limousine Comm'n Rules §§ 80-04, *et seq.* (requiring all drivers to maintain commercial vehicle insurance).

Some jurisdictions, including California, Illinois, Georgia, and Arizona, require Defendants to conduct background checks of peer-to-peer drivers. *See, e.g.,* Cal. Pub. Util. Code § 5445.2; O.C.G.A. § 40-1-193(c)(2); 625 ILCS § 57/15(a)(2); A.R.S. § 28-9555(A)(2). [*See also* Marklin Decl. ¶ 13; McCottry Decl. ¶ 12; Thompson Decl. ¶¶ 11, 15.] Some jurisdictions within Florida, including Miami, also require background checks. [Moshkani Decl. ¶ 17.] In other jurisdictions (such as Texas), Uber voluntarily conducts background checks. [Colman Decl. ¶ 46.]

Several jurisdictions also require peer-to-peer drivers to display vehicle "trade dress" in the form of an Uber "U" logo. [*See* Moshkani Decl. 19]; *see also* A.R.S. 28-9552(D)); CPUC Decision No. 13-09-045 (Sept. 19, 2013) at p. 31, ¶ h. Other jurisdictions do not impose trade dress requirements, and this requirement can vary within the State and even between counties

- 8-

that drivers may routinely cross into. [*See, e.g.,* McCottry Decl. ¶ 10; Sipf Decl. ¶ 8.]

New York City imposes significant control over for-hire vehicle services. Specifically, *every* driver must obtain and pay for a commercial for-hire vehicle license from the Taxi and Limousine Commission, a process that entails classes and tests. *See* New York City Taxi & Limousine Comm'n Rules §§ 80-04, 80-07. [*See also* Colman Decl. ¶ 46.] Also in New York City, as a matter of law, drivers may not solicit tips, and may not advertise for their own personal businesses or other businesses while on trips arranged using the Uber app. *Id* § 80-17(6). [*See also* Colman Decl. ¶ 46.]

Even where there is no state regulation, local regulations may apply and significantly affect the relationship between Defendants and drivers. Miami Dade, Broward and Palm Beach Counties each have municipal ordinances governing transportation providers using the Uber app and other similar applications. Broward County Ord. No. 2015-43; Miami-Dade County Ord. 16-42; Palm Beach County Ord. 2016-022. All three counties require each driver to have his/her vehicle inspected by ASE-certified mechanics. [Moshkani Decl. ¶ 14.] Palm Beach County also *requires* deactivation of a driver's account if the driver fails to provide documentation of their registration with a county-licensed, vehicle-for-hire company, or violates Palm Beach County's various for-hire driver requirements. [Colman Decl. ¶ 48.] *See also* Palm Beach County Ord. Sec. 19-219 (business records required), 19-227 (driver requirements).

The foregoing represents a *fraction* of the diverse and dense regulatory web applicable to Defendants, drivers, and their relationship.

## IV.   ARGUMENT

### A.   Plaintiff, a Chapter 7 Debtor, does not have standing to pursue any claims.

Shortly after suing, on September 27, 2017, Plaintiff voluntarily filed for Chapter 7 bankruptcy. *See* Petition for Bankruptcy, Case No. 16-23146 (S.D. Fla. Sep. 27, 2017). That filing converted Plaintiff's FLSA suit into one that could only be prosecuted by the trustee of his bankruptcy estate and not by Plaintiff individually. 11 U.S.C. § 541(a); *Parker v. Wendy's Int'l, Inc.,* 365 F.3d 1268, 1272 (11th Cir. 2004) (stating the trustee is the "proper party in interest and the only party with standing"). Since Plaintiff now lacks standing to sue, he cannot be an adequate named plaintiff in a collective action. Thus, the Motion should be denied and Plaintiff's collective allegations should be stricken. *Basterash v. Medx, Inc.,* No. 13 C 7814, 2014 WL 1199507, at *1 (N.D. Ill. Jan. 31, 2014) ("In this Court's view, trustees in bankruptcy (like any

- 9-

other trustees) are not authorized to gamble with the assets that they are administering...this Court rejects Trustee's effort to act as a representative plaintiff'"); *see also D'Aurizio v. Anderson Columbia Co.*, No. 3:11-cv-251-J-34TEM, 2011 WL 7789453 (M.D. Fla. Oct. 31, 2011) (acknowledging that FLSA claims on behalf of similarly situated plaintiffs "have no monetary value for the [Bankruptcy] Estate and do not automatically inure to it.").

**B.    Plaintiff fails to meet the standard for conditional certification.**

A plaintiff wishing to pursue a class under the FLSA must use the opt-in mechanism provided in 29 USC § 216(b) and demonstrate that he is "similarly situated" to the putative collective action members. *Hipp v. Liberty Nat'l Life Ins. Co.*, 252 F.3d 1208, 1217 (11th Cir. 2001). Specifically, the plaintiff must demonstrate that: (1) others desire to opt in to the litigation; and (2) these individuals are "similarly situated" regarding their job requirements and their pay provisions. *See Dybach v. State of Fla. Dep't of Corr.*, 942 F.2d 1562, 1567-68 (11th Cir. 1991). The Eleventh Circuit has suggested that district courts use a "two-tiered approach" to determine whether certification of a collective action is warranted. *Hipp v. Liberty Nat'l Life Ins. Co.*, 252 F.3d 1208, 1217-18 (11th Cir. 2001). At the initial stage, the district court evaluates the *Dybach* elements under a lenient standard. *Id*. at 1217. At the second, later stage, the Court re-evaluates the similarly-situated inquiry after discovery has taken place and presumably revealed more information regarding the plaintiff's claims. *Id*. at 1218.

Plaintiff's Motion pleads that the Court "must go no further than the first step." Motion, at *8. However, the Eleventh Circuit has noted that "[n]othing in our circuit precedent...requires district courts to utilize [the two-tiered approach]." *Id.* at 1219. Rather, "[t]he decision to create an opt-in class under § 216(b), like the decision on class certification under Rule 23, remains soundly within the discretion of the district court." *Id.* Notably, where a period of discovery precedes the motion, the rationale for a more lenient standard disappears. *Holmes v. Quest Diagnostics, Inc.*, 2012 WL 12876965, at *3 (S.D. Fla. Jun. 14, 2012) (applying more careful consideration to the parties' evidence on a motion for conditional certification when discovery had been ongoing for six months); *Pickering v. Lorillard Tobacco Co., Inc.*, 2012 WL 314691, *9 (M.D. Ala. Jan. 20, 2012). Here, discovery has been open *for over 5 months* - since November 2016. It makes little sense to reward Plaintiff by applying the "lenient" standard of review (that has sweeping implications) for his delay in conducting substantive discovery. Therefore, a more rigorous standard than is called for by *Hipp* is appropriate here.

- 10-

Even if the first-tier, "lenient" inquiry applies, the plaintiff's burden is "***not invisible.***" *Hart v. JP Morgan Chase Bank, N.A.*, 2012 WL 6196035, at *4 (M.D. Fla. Dec. 12, 2012) (emphasis added). Indeed, courts routinely deny motions for conditional certification even under the "lenient" standard. *See Powell v. Carey International, Inc.*, 2006 WL 4562105, at *1 (S.D. Fla. Mar. 27, 2006) (denying nationwide certification). Further, "the similarly situated requirement must be applied with some rigor" in a case implicating a large number of potential plaintiffs. *Holmes v. Quest Diagnostics, Inc.*, 2012 WL 12876965, at *3 (S.D. Fla. Jun. 14, 2012) (denying nationwide certification involving 15,000 potential plaintiffs).

Plaintiff's statement that he needs only to show a "reasonable basis" for his claim to satisfy the *Dybach* elements is only partly true. Motion, at *9. To establish that reasonable basis, Plaintiff must provide *substantial* and *detailed* factual allegations, supported by affidavits, which successfully engage Defendants' evidence to the contrary. *Grayson v. K-Mart Corp.*, 79 F.3d 1086, 1097 (11th Cir. 1996); *see also Palacios v. Boehringer Ingelheim Pharm., Inc.*, 2011 U.S. Dist. LEXIS 92002, at *16 (S.D. Fla. Apr. 19, 2011). These affidavits must attest to *facts*, not beliefs, opinions, conclusions, or hearsay, and must demonstrate a sound basis for the affiant's personal knowledge of such facts. *Palacios*, 2011 U.S. Dist. LEXIS 92002, at *16. Plaintiff's sole affidavit (his own) does not meet this standard. ECF No. 43-2, at *1-2, 9 (I make this Declaration based upon personal knowledge *and/or upon information and belief*….I declare…that the facts stated in [the Declaration} are true *to the best of my knowledge and belief*." (emphasis supplied)).

Plaintiff's assertion that the Court *must* grant conditional certification is also incorrect. Motion, at *8. Even at the first stage, this Court must consider whether, as the Supreme Court observed in *Hoffmann-La Roche* based on his proposed theory of liability, notice is "***appropriate***." *Hoffman-LaRoche, supra*, 493 U.S. at 169 (emphasis supplied). Under any standard, Plaintiff failed to meet his burden to establish that notice is appropriate for a nationwide putative class of ***many thousands of drivers***. Sending notice to such a vast group is entirely ***inappropriate*** where, as is the case here, each individual putative class member operates in materially different ways, subject to different market practices, and under different regulatory requirements, all of which bears directly on one or more of the critical inquiries in this action.

Firmwide:147290753.2 073208.1263

**C.**     **A single opt-in plaintiff cannot establish sufficient interest in a nationwide collective action covering potentially 15,000 people across 40 states.**

Before a court can issue notice, it must determine whether the plaintiff put forth sufficient evidence that putative collective members desiring to become a part of the lawsuit exist. *Dybach*, 942 F.2d at 1567-68. To demonstrate his need for nationwide class certification, Plaintiff filed ***one single*** consent to join from a driver in San Diego, CA, the significance of which is drastically minimized when compared to the thousands of drivers who used the Uber app in 40 states. Plaintiff's declaration does not identify the existence of any other individuals desiring to opt in. *Rodgers v. CVS Pharmacy, Inc.*, 2006 US Dist. LEXIS 23272, *3-4 (M.D. Fla. Mar. 23, 2006) (finding the plaintiff and two employees who signed consents to join the action demonstrated no reasonable basis to conclude other employees desired to opt into the class where their declarations did not identify specific employees who desired to join the lawsuit). Opt-in Plaintiff Schultz did not even submit an affidavit with the Motion. *Powell v. Carey Int'l, Inc.*, 2006 WL 4562105, at *2 (S.D. Fla. Mar. 27, 2006) (denying nationwide certification and pointing out the failure of opt-ins to file any affidavits addressing their work experience or relationship with the defendants).

Courts in this Circuit routinely find evidence even more substantial than presented here to be insufficient and a basis for denying conditional certification. For example, in *Powell*, driver plaintiffs sought certification of a nationwide FLSA collective. 2006 WL 4562105, at *1 (S.D. Fla. Mar. 27, 2006). The court noted that in the Eleventh Circuit, "[i]n order to proceed as a collective action, a plaintiff is required to demonstrate, through the pleadings and affidavits, that . . . there are other employees of the employer who desire to opt-in[.]" *Id.* at *4, citing *Dybach*) (emphasis added). The court denied conditional certification based on plaintiffs' failure to satisfy that requirement:

> Plaintiffs have not demonstrated that there are other employees of the employer who desire to opt-in such that a nationwide class action is appropriate. Although Plaintiffs request sending notice to over 500 cities nationwide, Plaintiffs have filed only one Notice of Consent form (two days ago) from an employee outside of the Miami/West Palm Beach area that desires to opt-in. Accordingly, because such facts do not support providing notice nationwide. Plaintiffs' motion must be denied.

*Id.*; *see also Gonzalez v. Winn-Dixie Stores, Inc.*, 2014 US Dist. LEXIS 130930, *4 (S.D. Fla. 2014) ("Plaintiff must, at a minimum, identify specific employees-beyond the current ones-who desire to join the lawsuit"), citing *Rodgers, supra; see also Manzi v. Hartman and Tyner, Inc.*,

- 12-

2011 U.S. Dist. LEXIS 73562, *2 (S.D. Fla. Jul. 8, 2011) ("[N]either Plaintiff nor his affiants have suggested that there are any additional employees, other than themselves, who desire to opt-in…Even after this case has been pending for almost five months, there is still no reason for the Court to believe that anyone else wishes to join this suit.").

Lacking evidence of interest in the lawsuit, Plaintiff's counsel *argues* that the existence of drivers who have opted out of the arbitration provision in their applicable services agreement is proof enough that individuals exist who *could* join the lawsuit. Argument alone, however, is insufficient. *See, e.g., Sandate v. Makotek, LLC,* 2006 WL 4792782, at *3 (M.D. Fla. Sept. 28, 2006) ("A plaintiff's or counsel's belief in the existence of other employees who desire to opt in and unsupported expectations that additional plaintiffs will subsequently come forward are insufficient to justify certification of a collective action and notice to a potential class."). Plaintiff's reference to other FLSA litigation against Uber is similarly unavailing because those plaintiffs indisputably do not want to join this action, having initiated their own. *Manzi v. Hartman & Tyner, Inc.*, No. 11-60426-CIV, 2011 WL 2110279, at *2 (S.D. Fla. May 25, 2011) ("The mere fact that Defendant has been sued before does not necessarily mean that there are other potential plaintiffs who wish to join *the instant suit.*"), citing *Rodgers*, *supra*. Simply put, Plaintiff's speculative belief that other drivers will want to join the lawsuit once they hear about it does not carry his burden. *Haynes v. Singer Co.*, 696 F.2d 884, 887 (11th Cir. 1983) (commenting that counsel's unsupported assertions of widespread FLSA violations and the likely existence of similarly situated employees are not enough). The Motion should be denied.

**D.    Plaintiff is not "similarly situated" to the putative nationwide class of drivers**

> 1.    Plaintiff's reliance upon the mere classification of "independent contractors" cannot establish a common theory of liability."

Next, to proceed as a collective action, Plaintiff must show that the members of the putative class are "similarly situated" to him regarding their job requirements, pay provisions and the commonality of their claims. *See Dybach*, 942 F.2d at 1567-68. Plaintiff's primary argument is that drivers are similarly situated because, according to him, they are misclassified by Uber as independent contractors. Motion at *9. Courts have soundly rejected the argument that the misclassification of workers alone justifies certification of a collective action. *See Palacios v. Boehringer Ingelheim Pharms., Inc.*, 2011 U.S. Dist. LEXIS 92002, at *16 (S.D. Fla. Apr. 18, 2011); *Colson v. Avnet, Inc.*, 687 F. Supp. 2d 914, 925 (D. Ariz. 2010); *Silverman v. SmithKline*

- 13-

*Beecham Corp.*, 2007 U.S. Dist. LEXIS 80030, at * 8 (C.D. Cal. Oct. 15, 2007) (denying FLSA certification despite allegations that pharma reps have the same primary job duties and were improperly classified by defendants as exempt); *Maestas v. Day & Zimmerman, LLC*, 2010 U.S. Dist. LEXIS 143653, *5-6 (D.N.M. Jan. 4, 2010) ("[G]ranting conditional certification based solely on commonly applied lawful practices would make no logical sense.").

Instead, the Court must determine whether the proof to demonstrate that the drivers are "employees" can be applied to the putative collective as a whole. *Palacios,* 2001 WL 6794438, at *6 ("If the ultimate issue to be determined is whether the Defendant properly classified each employee as exempt under the FLSA, the 'similarly situated' inquiry must include an analysis of each putative plaintiff's job duties….[which] necessarily involves a fact-by-fact inquiry.") No such proof exists.

2. The individualized analysis to determine "employee" status precludes class certification.

a. ***The "economic realities test" under the FLSA***

The FLSA does not apply unless there is a valid employer-employee relationship. 29 U.S.C. §§ 206-207. Under Section 203(e), the FLSA defines an employee as "any individual employed by an employer." Where independent-contractor status is at issue, the "economic realities test" is used to determine employee status. *Perdomo v. Ask 4 Realty & Mgmt., Inc.*, 298 F. App'x 820, 821 (11th Cir. 2008). Under this test, these factors are considered in determining whether a plaintiff is an independent contractor or employee under the FLSA: (1) the nature and degree of the defendant's control as to the manner in which the work is performed; (2) the plaintiff's opportunity for profit or loss depending on his managerial skill; (3) the plaintiff's investment in equipment or materials, or his employment of workers; (4) whether the service rendered requires a special skill; (5) the degree of permanency and duration of the working relationship; and (6) the extent to which the service rendered is an integral part of the defendant's business. *Parilla v. Allcom Constr. & Installation Servs., LLC*, 2009 WL 2868432, at *2 (M.D. Fla. Aug. 31, 2009). No factor is dispositive and courts must consider the totality of each plaintiff's circumstances. *Id.*

- 14-

  **b.** *Courts have repeatedly cited the fact-intensive nature of the economic realities test as reason to deny a motion for conditional class certification.*

  Because the economic realities test is fact-intensive and highly individualized, courts have repeatedly held that determining whether an individual is an independent contractor or an employee is not appropriate for collective determination. In *Demauro v. Limo, Inc.*, 2011 WL 9191 (M.D. Fla. Jan. 3, 2011), the plaintiffs were sedan drivers in the Tampa Bay area that sought to conditionally certify a nationwide class of all the defendants' independent-contractor drivers. *Id.* at *4. Without even engaging in an analysis of the independent-contractor factors, the district court found that, "[t]his necessarily individualized assessment eviscerates all notions of judicial economy that would otherwise be served by conditional class certification." Accordingly, the district court denied the motion for class certification, finding that neither a local nor a national class of drivers would be appropriate under the circumstances. *Id.*; *see also West v. Verizon,* 2009 U.S. Dist. LEXIS 82665, at *12 (M.D. Fla. Jul. 20, 2009).

  Likewise, in *Pfaahler v. Consultants for Architects, Inc.*, the defendant placed architects with local firms on a contractual basis. 2000 WL 198888, at *1 (N.D. Ill. Feb. 8, 2000). The plaintiff claimed he was defendant's employee and entitled to overtime pay. *Id.* at *2. He further claimed he was similarly situated to potential class members because they were all misclassified as independent contractors and denied overtime pay. *Id.* at *4. Denying conditional certification, the court reasoned:

> [Pfaahler] has failed to demonstrate any basis for a finding that he is similarly situated with other potential claimants. Liability in Pfaahler's case will turn on whether Pfaahler is an "independent contractor" or an "employee" within the meaning of the FLSA. The same is true for every potential claimant included in the collective action . . . ***In order to determine who is an independent contractor and who is an employee, the court would be required to make a fact-intensive, individual determination as to the nature of each potential claimant's relationship with [defendant] . . . Where this is the case, certification of a collective action under the FLSA is inappropriate.***

*Id.* at *2 (emphasis added). The same tortured process would be required here. *See also In re FedEx Ground Package Systems, Inc., Employment Practices Litigation*, 662 F. Supp. 2d 1069, 1081 (N.D. Ind. 2009) (individualized inquiry of "employee" status precluded conditional certification).

  Plaintiff mistakenly focuses on a California district court decision in *O'Connor v. Uber*

certifying a **Rule 23** class action of California drivers asserting claims under California's Labor Code. Despite a different jurisdiction, different legal claims, and different facts, Plaintiff argues that the certification of one claim in *O'Connor* for a class of California drivers warrants *nationwide* certification of his FLSA minimum wage and overtime claims. However, Plaintiff proffers no evidence tying the deposition testimony he cherry-picks from *O'Connor* to the services he provided in Florida. To be sure, rendering a decision here – on a motion for conditional certification in an FLSA case – based on the O'Connor record is entirely unjustified. This case is, however, on all fours with *Demauro*, *Pfaahler* and *FedEx Ground*. Thus, Plaintiff's Motion should be similarly denied.

        3.     There is no evidence of uniform misclassification resulting in common FLSA violations.

As the courts found in *Demauro*, *Pfaahler* and *FedEx Ground*, this Court must focus on the economic realities of the parties' relationship, and consider all the circumstances of the activity of each putative plaintiff, rather than just one isolated factor, to determine whether the putative collective action members: (1) are similarly situated; and (2) have successful claims. This requires an assessment of whether the plaintiff's claims are amenable to generalized evidence. *Palacios v. Boehringer Ingelheim Pharm., Inc.*, 2011 WL 6794438, at *6 (S.D. Fla. Apr. 19, 2011).

Plaintiff proffers no common evidence that will prove that he and every other collective member are misclassified and are covered employees under the FLSA. Plaintiff primarily relies on the same stale, cherry-picked testimony from *O'Connor*. That very same testimony, however, amply demonstrates that Uber's practices vary by market. *See*, *supra*, Section III.C. Plaintiff provides no evidence to tie those practices to his own Uber experience, to Defendants' operations in South Florida, or to Defendants' practices anywhere during the relevant statutory period. Recently, the Florida Third District Court of Appeals, using *Florida* law and testimony regarding a *Florida* driver and Uber's *Florida* operations, affirmed that a driver was properly classified as an independent contractor by Uber, and was not an "employee" for purposes of Florida's unemployment compensation law. *McGillis v. Dept. of Econ. Opp.*, No.3D15-2758 (Fla. 3d DCA 2017), at *13, citing *Rasier, LLC v. Fla. Dept. Econ. Opportunity*, 0026 2834 68-02 McGillis (Fla. Dept. Econ. Opp. Dec. 3, 2015) at *11, attached as Exhibit "E."

Plaintiff submits one declaration (his own) wherein he claims to be "familiar with the

- 16-

Uber-Tech and Rasier-DC policies [he] work[s] under." Plaintiff provides no foundation for his claim that "*[a]ll* drivers for Uber-Tech and Rasier-DC perform their job duties under the following similar work policies." ECF No. 43-2 at *1-2, ¶6-7 (emphasis supplied). Further, Plaintiff submits no evidence that indicates whether these "policies" apply to UberBLACK or UberSUV drivers, products he has never used. He also provides no evidence to extrapolate these same "work policies" apply to drivers, including Opt-in Plaintiff Schultz, who use the lead generation services provided by other Uber-subsidiary defendants in other states.

Even if those obstacles were surmountable, Plaintiff's evidence of common "work policies" consists primarily of eligibility requirements to activate a driver account, such as the need to have a qualifying vehicle; to possess a valid driver's license, and to maintain adequate auto insurance. These "policies" do not distinguish Plaintiff from all other drivers on the road in Florida, and thus do nothing to indicate Uber controls Plaintiff or other drivers. Other "policies" such as the need to use the app to accept leads via the app, to pick up rides solicited via the app, and to log pick-ups and drop offs to calculate the fare (which is mileage based) cannot establish the "similarly situated" element. The mere use of the app cannot generate commonality when, as argued, *supra*, the classification of drivers (which is much more closely tied to an FLSA claim) does not.

Other "work policies", such as background checks, are dictated by local regulatory requirements for transportation-for-hire providers, which vary widely state-to-state and city-by-city and relate to Uber's purported "control" over drivers. *SIDA of Hawaii, Inc. v. NLRB*, 512 F.2d 354, 359 (9th Cir. 1975) (government-imposed control not attributable to employer for purposes of determining independent contractor status). The various regulatory environments in which individuals provided transportation services create the need for a highly individualized factual inquiry into which particular regulations govern which driver and bear directly on one of the critical legal inquiries under the FLSA's economic realities test: who controls the services provided by drivers. *Francois v. Gulf Coast Transportation, Inc.,* 2016 WL 4120499, at *4 (M.D. Fla. Aug. 2, 2016) (denying conditional certification in an FLSA independent contractor misclassification suit because, among other reasons, the regulatory scheme applicable to the taxi-driver plaintiffs were relevant to "control" and varied by jurisdiction). Deactivations, star ratings, and acceptance rates, which Plaintiff claims are evidence of "control," are left to the decentralized discretion of the individual markets. [Colby Decl. ¶ 13; Black Decl. ¶¶ 9-10, 19;

McCottry Decl. ¶¶ 6-8, 19, 21-22.]

What is left is the allegation that Uber calculates the fare based on rates it sets. These fares vary by city/market and a driver can increase his/her earnings by accepting incentives and promotions to drive during peak times and/or in underserved locations. Regardless, "a plaintiff must make some rudimentary showing of commonality between the basis for his claims and that of the potential claims of the proposed class, beyond the mere facts of duties and pay provisions." *White v. Osmose, Inc.*, 204 F. Supp. 2d 1309, 1314 (M.D. Ala. 2002), *cited with approval in Anderson v. Cagle's, Inc.*, 488 F.3d 945, 953 (11th Cir. 2007) *cert. denied*, 553 U.S. 1093 (2008). Thus, the fact that Uber sets rates is no more of a basis to conditionally certify a collective action than is the fact that it classifies its drivers as independent contractors.

In contrast to the lack of quality and breadth of the Plaintiff's evidence, Uber's evidence amply establishes that most practices that relate to *relevant* indicia of control are left to the decentralized discretion of the individual markets. The local market teams determine product offerings, default pricing and Defendants' fees (which can affect drivers' earnings), the content and volume of communications to the drivers, rider ratings thresholds, and acceptance and cancellation practices. [Colby Decl. ¶ 13; Black Decl. ¶¶ 9-10, 19; McCottry Decl. ¶¶ 6-8, 19, 21-22.] Drivers also contract with different Uber subsidiaries, and their contractual terms may differ in material ways depending upon the time, product and geography. [*Cf.*, *e.g.*, Colman Decl. Exs. 7, 8(a)-(b), 9(a)-(b), *with id.* Ex. 17.] Finally, drivers and Defendants must abide by local regulatory requirements for transportation-for-hire providers, which vary widely state-to-state and city-by-city. Where, as here, the parties' briefing and evidence demonstrate that the putative class members' circumstances are dissimilar under the economic realities that must later be analyzed to determine if FLSA coverage exists, courts routinely find the "need for individualized analysis eviscerates all notions of judicial economy that would otherwise be served by conditional certification." *Pena v. Handy Wash, Inc.*, 2015 WL 11713032 at *10 (S.D. Fla. May 22, 2015). Plaintiff's Motion should therefore be denied.

## E. <u>Variations in potential exposure also preclude conditional certification.</u>

Even if Plaintiff could articulate a common method by which to prove employment status and to show drivers worked in a "manageably similar factual setting" (neither of which Plaintiff has done), that would not end the analysis. A key aspect of Plaintiff's FLSA claims is that his earnings, and the earnings of other class members, were allegedly reduced below the minimum

- 18-

wage by yet-to-be demonstrated expenses. EFC No. 38, 29. While Plaintiff's Motion relies almost exclusively on *O'Connor*, he conveniently ignores that the decision certified only one of the two claims, finding that the plaintiffs' expense reimbursement claim under Ca. Labor Code Section 2802 was not appropriate for certification. *O'Connor*, at \*14 ("there may be substantial variance as to what kind of expenses were even incurred [by the putative employees] in the first place," and "it may be challenging to determine on classwide basis whether a particular expense (or type of expense) was 'necessary' or incurred in 'direct consequence' of the employee's duties."). Like the plaintiffs in *O'Connor*, Plaintiff provides no argument as to what common evidence he would rely upon to establish this claim.

Similarly, to obtain recovery, each member of the putative collective must first prove that he or she worked for over 40 hours each week or earned less than minimum wage during **compensable** time, which will require an individualized assessment of how they used their waiting time, rendering collective treatment both inappropriate and inefficient. *West v. Verizon*, 2009 U.S. Dist. LEXIS 82665, at \*12 (M.D. Fla. Jul. 20, 2009) (denying class certification because, among other reasons, compensability of waiting time under the FLSA was an individual question that precluded a finding that putative class members are similarly situated); citing *Birdwell v. City of Gadsden*, 970 F.2d 802, 807 (11th Cir.1992) (time spent by employees engaged to wait for an employer's call to duty may be compensable under the FLSA depending on the degree to which the employee may use the time for personal activities); *see also Lewis– Gursky v. Citigroup, Inc.*, 2017 WL 892604 (M.D. Fla. Mar. 6, 2017) (denying motion for conditional class certification because "material differences between the members of the proposed collective would lead to unmanageable individualized inquiries regarding joint employment if a collective were to be certified.").

## F.    If Notice Is Permitted, It Must Be Fair And Balanced

While Defendants object to the content and form of Plaintiff's proposed Notice as argumentative and misleading, briefing their objections would be premature. Defendants respectfully request that, if the Court conditionally certifies a collective, the Court order the parties to (i) confer to agree upon the content, form and distribution of notice, and to the extent they cannot agree on such matters, (ii) brief any outstanding issues for resolution by the Court.

## V.    CONCLUSION

Plaintiff seeks certification of a staggeringly large class based on the thinnest of evidence.

However, he fails to meet even the most lenient burden required to justify conditional certification of a class involving this many potential plaintiffs. Conditional certification is not appropriate under the circumstances and Plaintiff's Motion must be denied.


DATED this 26th day of April, 2017              Respectfully submitted,

                                                /s/ *Jessica T Travers*
                                                Courtney B. Wilson, Esq.
                                                Florida Bar No. 0614580
                                                E-mail: cwilson@littler.com
                                                Secondary:  kljackson@littler.com
                                                Lindsay M. Alter, Esq.
                                                E-mail: lalter@littler.com
                                                Florida Bar No. 103237
                                                Jessica Travers, Esq.
                                                Florida Bar No. 18129
                                                E-mail: jtravers@littler.com
                                                Littler Mendelson, P.C.
                                                Wells Fargo Center
                                                333 SE 2nd Avenue, Suite 2700
                                                Miami, FL 33131
                                                Telephone:  (305) 400-7500
                                                Facsimile:  (305) 603-2552
                                                *COUNSEL FOR DEFENDANT*

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on this 26th day of April, 2017, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF. I also certify that the foregoing document is being served on this day on all counsel of record or *pro se* parties identified on the Service List in the manner specified, either via transmission of Notices of Electronic filing generated by the CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

                                        BY: /s/ *Jessica T Travers*
                                              Jessica T Travers

- 20-

## SERVICE LIST

### *COUNSEL FOR PLAINTIFF*
Gerald F. Richman, Esq.
Florida Bar No.: 066432
E-mail: grichman@richmangreer.com
Adam M. Myron, Esq.
Florida Bar No.: 0895121
E-mail:  amyron@richmangreer.com

Richman Greer, P.A.
One Clearlake Center, Suite 1504
250 Australian Avenue South
West Palm Beach, Florida 33401
Tel:  (561) 803-3500
Fax: (561) 820-1608

Stephen J. Schultz, Esq.
Email: schultz@sbemp.corn
Slovak Baron Empey Murphy & Pinkney LLP
2240 Fifth Avenue
San Diego, CA 92101
Tel:  (619) 501-4540

Thomas G. Schultz, Esq.
Email: TSchultz@LSRCF.com
LSRCF Law, PLLC
1111 Brickell Ave. #2200
Miami, FL 33131
Tel:  (305) 760-8544
Fax:  (305) 356-5720

Firmwide:147290753.2 073208.1263